and the United States Bureau of Land Management. Is it Marcuccio? Am I pronouncing that correctly? Yes, okay. So I'll give you a minute to get set up. Counsel, when you're ready, please approach the lectern and begin. Good morning, Your Honors. May it please the Court. My name is Andrea Marcuccio, and I represent Appellants, Friends, and Family. Counsel, could you pull that? Those microphones are not very sensitive. Try and stay as close to them as you can. Is this better? Yeah, that's better. And I'd like to reserve three minutes for rebuttal. This is a straightforward case where the Bureau of Land Management violated the Wild Free-Roaming Horses and Burros Act and the National Environmental Policy Act. BLM spent millions of taxpayer dollars to fund the Winnemucca Off-Range Corral. BLM calls this a corral. In reality, it's an industrial feedlot that holds up to 4,000 wild horses and burros on less than 100 acres of land and produces 40,000 tons of manure annually. This facility is profoundly unsuitable for this purpose. Counsel, it's my understanding that this is a temporary holding facility before the animals are either adopted out or moved to a larger range pasture. Is that correct? Yes, Your Honor. They are held there for an unknown period of time because beyond the snow… So we're talking months, potentially? Yes, Your Honor. So the only evidence we have is from 2008 where they said they were held there about 210 days, but that's when there was less facilities. But the animals are given, as I understand it, about 750 square feet each of area in which to, I'm not sure what the word is, but habitat, inhabit. Yes, Your Honor.  And again, this facility is profoundly unsuitable for this purpose because it sits on flood-prone soil and creates inhumane conditions. And I just want to move to the first issue that BLM violated the Wild Horse and Burro Act by funding an inhumane facility. Well, you say inhumane, but as I understand it, the contract incorporated the standards of care that were developed using expert witnesses from UC Davis's veterinary school and other animal wildlife experts. So how is that inhumane if the government is essentially following the advice of experts in the field? Your Honor, the guidance does not establish what is humane under the Wild Free Roaming Horses and Burros Act. That's not quite my question. My question, though, is how can we declare this conduct to be inhumane when the agency has followed recommendations of an expert panel? And why does that amount to arbitrary and capricious decision-making under the environmental statute? Your Honor, the guidance itself is extremely vague, and it doesn't encompass the unique issues with this facility. Doesn't it address basically the standards of care that apply to all of these types of facilities? What are there, about 10 or 12 of them in the West? Your Honor, there's about 28 off-range corrals and like 13 specifically for preparation. So if they all follow these, I'll call them standards of care, which you acknowledge include things like 750 square feet per animal. Again, I'm having a hard time understanding why you label this inhumane. Your Honor, the guidance doesn't specifically say 700 feet is what they're saying. Isn't that incorporated? I thought that was incorporated into the contract here. No, Your Honor, so the guidance itself doesn't specifically say that, but there's adoption requirements that mention 400 square feet per animal, and BLM claims it exceeded those guidelines, but those aren't specific to the off-range corral. For example, BLM says that the guidance doesn't require shelter for animals, but the guidance says that BLM is required to say what shelter is appropriate for the facility. Counsel, I'm looking at SER 55, which basically is these standards that I've been referring to. For example, it talks about the importance of having sufficient grading of the pens so that it promotes drainage, reduces wet ground conditions, allows for routine manure removal, provides access to shade and shelter, talks about having on-call veterinarians, and you're saying that's inhumane? Your Honor, there's... Why did the agency abuse its discretion in following this guidance? Your Honor, there's unique issues at this specific facility that are not addressed in the guidance. What kind of issues? For example, the facility holds 4,000 animals, and at the time that this decision was made, the average capacity was 1,400 animals. So this is the largest facility. Its own experts found that... So it's only being operated at about 50% of its capacity? No, Your Honor. We get these kind of cases not just in the environmental arena but in jail litigation where we've got 1,500 people in a jail that was designed to hold 1,000. That's not the problem we have here. There are fewer animals than what the facility was designed to hold. Isn't that true? No, Your Honor. So as of right now, it's holding about 3,500 horses. And it was built to hold 4,000, was it not? Yes, and I'm saying that other facilities, their average capacity was 1,400 per animal. Where's the beef here? So there's also BLM's own experts warned that the soil would become a huge muck hole when wet and a dust bowl when dry. Many veterinarians commented and said this facility is inhumane, and BLM did no analysis on how it is humane. They just said... But if the agency impanels a panel of expert veterinarians from a well-respected veterinary school of medicine and follows the recommendations of those experts, isn't the agency entitled to pick and choose which experts they're going to follow? Again, this facility, like that guidance is extremely vague, and it does not address the specific impacts of this facility. It doesn't say anything about shelter. Counselor, you're not answering my question. You've come forward with your panel of experts that says something different from what the government's panel of experts said, and the agency has to choose. And the Supreme Court has told us that we have to give a heightened standard of decisions by agencies, in this case the Bureau of Land Management that's directed by Congress to round up excess wild horses and burros and to care for them in these kinds of facilities. Your Honor, again, there's no experts that said that this facility is humane. Again, the guidance says that they have to say what shelter and shade is appropriate for a facility. They have never made that determination. They have just not included any shelter or shade at all. Any evidence in the record that this facility is killing or harming more horses than other similar facilities of the 28 around the country? Your Honor, there is plenty of evidence that this particular facility is inhumane. Again, the standard is un- Counselor, you keep giving me conclusions. I'm asking for specific information here as to, you know, is this facility somehow being operated in a way that's different from the other 28, or are you challenging the standards of care as it applies to all 28? If that's the case, then this is a bigger case than what you told the district court it was. Your Honor, we're talking about this particular facility, and there is many issues that are unique to this facility. Again, it's the highest capacity facility at the time that it was created, and it has dusty, mucky soil. It has no shelter in shade. And again, we don't have facts about other facilities, but there's certainly tons of facts in this record about how this particular facility is inhumane. It will only be cleaned twice a year. Again, the guidance doesn't even recommend how many times. The guidance says twice a year or more as required, does it not? It says two to four times a year. And do you have evidence that they're doing it less than two to four times a year? No, Your Honor. So is your position that they have to do it more than four times a year? Is that what you're saying? Yes, Your Honor. So many veterinarians said that this level of cleaning is not adequate to be humane for the facility, and no expert said otherwise. And again, the guidance doesn't even say how many times you should clean it. It doesn't recommend cleaning it at all. So if we rely on these guidance, then they wouldn't clean the facility at all, and that would be humane under the Act. And again, this has not gone through notice and comment rulemaking, and it does not say what is humane under the statute. So is your argument that the agency cannot rely on the recommendations of its experts without going through the formal APA notice and comment procedures? Otherwise it's not binding when it's incorporated into the contract of the private operator of the facility? Your Honor, the argument is that no expert has found this particular facility is humane. That's not my question. My question is are you taking the position that these standards of care have to be adopted through formal rulemaking proceedings? That's my question. What's your answer? No, Your Honor, it's not that it has to be adopted, but in order for it to rely on that and say that this is what it means for it to be humane under the statute, then, yes, it would have to go through notice and comment rulemaking so that the public can have a chance to comment on that and other veterinarians can have a chance to say, I think this is humane under the statute. But didn't you provide that evidence to the agency while it was considering the bid solicitation? Yes, Your Honor, we did provide evidence, and they said it's outside the scope and it merely relied on the guidance that doesn't say what's humane. It didn't say when we brought up particular issues with this facility, they said that comment's outside of the scope and they're going to rely on the guidance. But that guidance doesn't address these specific issues, again, like lack of shelter. It doesn't address what shelter is humane. And what's the best case you have to support your position that we have to make a legal determination as to whether or not this is humane or inhumane? Your Honor, in Kaiser v. Wilkie, it says that since there's no form of procedures and BELM does not view its guidance as authoritative policy, the court should not defer to it. And again, this is the same issue that is happening under NEPA, too. There is no analysis of the wild horses in Burroughs at all in the actual environmental assessment. Instead, even though they're legally responsible for protecting them, and NEPA unquestionably requires consideration of those impacts. As stated before, there's unique impacts at this particular facility, and it's extremely concerning that they did not consider these. And in that particular case, the Ninth Circuit has held in current BELM that it's obviously inadequate to substitute informal guidelines for the hard look that NEPA demands, because the guidance hasn't been subject to NEPA review. And again, under this interpretation, these site-specific impacts will never be considered anywhere. And this is the time to consider them now. And again, the guidance doesn't consider the unique concerns of packing thousands of wild animals into a dusty, mucky, flood-prone feedlot, and knowing this information could have changed BELM's decision. They had full discretion to have additional protections for these facilities. They could have said, 750 square feet isn't enough. They could have said, we're going to give them shelter. But they didn't. They didn't even consider the animals at all. Is there anything in the record that tells us whether or not they've applied the same standards to any of the other 27 facilities? No, Your Honor. There's evidence that these facilities follow those standards, but again, they are not site-specific. They do not address the specific concerns at this facility. And there's no evidence that those facilities are humane because they follow those standards. BELM has provided no evidence, and they've provided no cases that allow them to rely on this guidance, instead of taking the hard look. Counsel, you are not, I take it through this litigation, challenging the statutory requirement that BELM round up excess animals in order to properly manage, I'll call it the herd of wild horses and burros throughout the West. No, Your Honor. Okay. So it's just an attack on this particular facility. Yes. It is that this facility is, first of all, inhumane under the Wild Horse and Burro Act, and second of all, BELM did not take a hard look at the impacts to the animals under NEPA. And those are two separate claims with different standards. And again, they said that these impacts will be analyzed in future environmental assessments, but those environmental assessments do not analyze the impacts of this specific facility. And under their interpretation, these impacts will never be analyzed. And there's a lot of experts and veterinarians that said these animals will be impacted, and we want to, we're bringing up these concerns, and BELM just said those concerns are outside the scope. So they didn't even take a hard look at all. They didn't take any look at these impacts, and they do not deny that. Can I ask you to turn to a preliminary issue? And I recognize that the government didn't really raise this in their brief, but it is a jurisdictional issue, which is standing. So as I understand your representational standing argument, it's that it's based on three people, Mr. Downer, Mr. Rose, and Mr. Booth, and you have their declarations in the record. But I think if I've read them correctly, that only one of them has ever been to this facility. The rest are talking about perhaps in the future they'd like to visit. So my concern is whether Friends of Animals has representational standing based on these declarations. It seems as if the whole thing hinges on Mr. Downer, who says he's been there. Your Honor, at the time that this case was filed, the facility wasn't open, and it is on private land. So whether the public can view it is up to the discretion of the owner, which they do have public, they do invite the public to view it once in a while. So is it then your position that, it's almost hypothetical, but that they will visit or they could visit in the future and that there's an injury because they have this interest in observing the animals and aesthetic interest, aside from seeing them in the wild, because you've already agreed that you're not challenging the statutory authority of the BLM to round up excess animals from the herd. So would they have an injury in not viewing them in a certain way at a range? Yes. Yes, Your Honor. So it's that our declarants have an interest in viewing them in humane conditions. And as in Laid Law, in the case Laid Law, that was where people had interest in floating down the river, but they had never been and they weren't going to go because of pollution. So that type of future injury is accepted under the court. And then we also have another standing declarant, Mr. Booth, who lives in the area, and he is worried that this will pollute his community and impact his— He lives like 15 miles away, something like that? Yes, Your Honor. And so there's kind of two types of standing. First is that environmental, and second is that animal, wanting to view animals humanely. And I see I am running out of time, so I would like to reserve the rest for rebuttal. How much did you request? Three minutes? Yes. I will give you three minutes. Thank you. May it please the Court, Rebecca Jaffe appearing on behalf of the United States. At the outset, I want to note the context here. There are over 60,000 more excess wild horses on public lands than the appropriate management level nationwide. The herds double in size every four years, and the overpopulations deplete forage and water resources, destroy habitat, and cause safety issues. Counsel, as I understood your opposing counsel's answer to my question, they're not challenging the need to round up excess wild horses for that reason. Can you jump right into what I think is the core of their argument about this inhumane treatment and failure to adequately assess the impact of the provisions that were included in the contract for the operation of the facility? Yes, Your Honor. Addressing the claims under the Wild Horse Act and the accompanying regulations, BLM ensured that wild horses in this facility would be treated humanely. First off, BLM's regulations prohibit treating a wild horse or burrow inhumanely. They define humane treatment as handling compatible with animal husbandry practices accepted in the veterinary community without causing unnecessary stress or suffering. That's at 43 CFR 4700.5E. And inhumane treatment, the regulations define as any intentional or negligent action or failure to act that causes stress, injury, or undue suffering, and is not compatible with animal husbandry practices accepted in the veterinary community. To comply with that mandate here, BLM required the contractor, as a condition of the contract, to comply with its Comprehensive Animal Welfare Program standards. So our Wild Horse Act argument has two parts. One, BLM required the contractor to comply with the Comprehensive Animal Welfare Program standards. That requirement is included in the contract. For example, the court can look at SCR 33 in the contract solicitation, and it's now in the contract. And the guidelines were attached to the contract solicitation at SCR 51-74. And the guidelines were the standards of care that I was discussing with opposing counsel. Yes. Opposing counsel, if I understand their argument correctly, is saying that those guidelines are not specific to this facility and that there are specific concerns here related to the soil, whether it's going to be overly dry or overly wet, which could cause problems for hooved animals if it's wet, and shade and size and cleanliness and those sorts of things. So how do those guidelines apply specifically to this facility, other than being adopted through the contract? Is there something that is within those guidelines that addresses those concerns that the plaintiffs have raised? So I have a two-part answer to that, Your Honor. I think it is true the guidelines are generally applicable to BLM's Wild Horse Program generally. I believe the court asked my opposing counsel, are these the same standards that apply at all off-range corrals? And the answer is yes. The citation for that is S.E.R. 12, paragraphs 30 to 31. The guidelines do have very specific information. For example, there must be shade and shelter for injured or weak animals. The site for that is S.E.R. 55. But in addition to the guidelines, also the guidelines mandate that ground surfaces must be maintained to promote drainage, reduce wet ground, allow for routine manure removal. That's at S.E.R. 55. But in addition to those standards, the Comprehensive Animal Welfare Program standards, BLM mandated additional requirements in the contract solicitation here. For example, it required a minimum of 700 square feet of space per animal. That was at S.E.R. 34, although this contractor actually designed the facility to provide 750 square feet per animal. That's at 2ER 148. So each pen will have no more than 100 animals and be over 1.7 acres in size. The pens will be cleaned two to four times a year. The site for that is 2ER 148. And BLM employees can mandate additional cleanings if they determine that it's necessary. The BLM also mandated 20 percent extra feeding space for timid animals so they don't get boxed out by the more aggressive ones. The site for that is S.E.R. 35. If I can interrupt. I understand you're relying on the contractual requirements and the standards. But then your friends on the other side point to this BLM response to public comment and it has some kind of cryptic statement about comment is outside the scope of the EA. Can you explain that? Because I wasn't sure what to make of that BLM response to public comment. Yes, Your Honor. So I believe that that is referencing 2ER 174 where, if I can just go there, Your Honor, where the commenter said that wild horses have particular physiological reactions when they're rounded up and held in captivity. And BLM was saying that the conditions in this off-range corral are basically the same as our other off-range corrals and that we would analyze the impacts to individual animals in a different environmental assessment. What BLM is saying there is that they analyze the impacts to animals from being gathered from the range in gathered decisions. And when they do those gathered decisions, they look at a host of different potential impacts. So first of all, they start with gathering. Are we gathering the animals by helicopter? Are we doing a bait or a water trap? Are we administering fertility treatments? Some of the fertility treatments involve darting the animals and then they get scared. Some of them involve surgical procedures. They look at what are the impacts from transporting the animals. So BLM is saying there's a separate decision we make where we look at the impacts to animals from all the different things that might happen to them when we decide to gather them from the range and treat them, administer fertility treatments, transport them elsewhere, house them in off-range corrals, take them to facilities where they can be adopted, send them to off-range pastures. So BLM analyzes that in a separate place. Just for the gathering process. For the gather because they know once we gather the horses, other things will happen. We'll transport them. And they know when they analyze the gathers, all of our off-range corrals operate very similarly. They all comply with the Comprehensive Animal Welfare Program standards. So when we decide to gather them, we'll look at the impacts to the horses from ending up in one of these corrals. Here the question was do we enter into this contract or not? They were not asking the question of should we gather any animals, should we transport any animals. It was should we enter into the contract to build a facility to expand our off-range corral capacity, which we know we desperately need more of. And as I understand it, there are additional requirements included by requiring that the facility obtain a state concentrated animal feeding operation permit. Can you address that? What's included in that? Yes, Your Honor. So a concentrated animal feeding operation is a facility that houses a number of animals over certain thresholds. It applies to feedlots too, doesn't it? For beef and pigs and all kinds. And chickens, yeah. And there's different thresholds of how many chickens you need versus cows, just basically depending on how much waste an individual animal will produce. So this is a concentrated animal feeding operation. And the concentrated animal feeding operation permits require the contractor to prevent any waste from entering surface waters. And in Nevada, they also require the contractor to prevent excessive nutrients from seeping into groundwater. The site for that is 2 ER 146. The Bureau considered and described what this permit would do. It basically requires the contractor to build an engineered drainage system to catch runoff, to have a containment pond, to store waste on site in a manner that prevents it from entering into surface waters. The site for that is 2 ER 160. BLM described potential requirements of the permit, like berms or dikes or groundwater monitoring wells. That's at 2 ER 161. And then I do want to note here that BLM required even more than Nevada law requires for the concentrated animal feeding operation permit. Nevada law says that the system has to be designed to withstand a 25-year flood event, but BLM said, no, we want you to design the system to withstand a 100-year flood event. And the site for that is SCR 16. So BLM reasonably determined that the impacts would be negligible because the contractor would have to obtain and comply with the concentrated animal feeding operation permit, plus there were additional BLM requirements that the contractor had to comply with. And BLM's rationale there is at SCR 22 to 23. I want to finally note, Your Honor, that I think the BLM complied with the National Environmental Policy Act. Plaintiff's complaints otherwise are flyspecking, particularly given the recent Supreme Court decision in Seven County Infrastructure Coalition, which emphasized the importance of deference in NEPA cases. And this court recently held that Seven County applies to environmental assessments, which is the type of NEPA analysis that we have here, in Cascadia Wildlands versus BLM. Only the Westlaw site is available at this time. The Westlaw site is 2025 Westlaw 2460946. At SCR 23, the court said, although Seven County involved an environmental impact statement rather than an environmental assessment, we find its teachings fully applicable here. If the court has no further questions. It doesn't look as if we do. Thank you. It should affirm. Your Honor, I'm sorry. One more thing. We did not brief standing. We can provide supplemental briefing on that. I will note that we did not brief standing. There's a 1988 Ninth Circuit case that says that plaintiffs can have standing if they will visit wild horses in an off-range facility and be upset by it. There are other circuits that hold that you don't have standing if you go out and upset yourself by choosing to go somewhere. But there is that case. Thank you. So there's a couple of things I just want to address. So regarding the shelter on SCR 55, it's the guidelines specifically said shelter will be evaluated and determined by managers as appropriate for their region and function of their facility and the condition of the animals under their care. BLM never did this. And, again, the shelter that opposing counsel discusses is only for sick animals. Healthy animals have no shelter, despite the fact that this is in desert temperatures that swing from scorching heat to below freezing. And one other point is that the CAFO permit, the Ninth Circuit has held that this is a NPDES permit, which is under the Clean Water Act. And the Ninth Circuit has held many times that a non-NEPA document, let alone one prepared and adopted by the state government, cannot satisfy a federal agency's obligations under NEPA. But haven't we also said that if the permit addresses the federal issue, can't the agency rely on requiring the contractor to meet state permit requirements in order to make sure that the waste does not enter groundwater in the vicinity? Your Honor, is there a specific case you were talking about? I'm not sure where that was held. Well, I think we have said that it is not improper for an agency to look to state standards if it is addressing the federal issue, which you're raising here that the agency should have, I guess, adopted special standards or different. Your Honor, I think they're allowed to look at the standards, but they're not allowed to use those standards as a replacement for their obligation to take a hard look at the impacts under NEPA. But if those standards require the contractor to build berms and to address runoff of groundwater and that sort of thing, and that happens to be in compliance with the state permit, that also addresses the federal concern, does it not? Your Honor, in Environmental Defense Center v. BOEM, the Ninth Circuit specifically held that a NPDES permit, which is the same permit issue here, can't substitute for an agency's duty to determine whether the impacts are insignificant. And again, the reason for that is because the agency look, if that's what the contractor is being required to do, what I don't understand in your argument is why can't the agency look to those requirements in order to determine that there's not going to be a problem with polluting the groundwater if the agency obtains or, excuse me, if the contractor obtains a CAFL permit and operates the facility in compliance with it? Because you're telling me our case law says that the agency can't do that in trying to determine whether or not in the environmental assessment that a full environmental impact statement is required. Your Honor, I see I've run out of time, but I'll answer this. You can answer the question. Okay. So there's a couple points to this. First of all, the general CAFL permit requirements do not address the specific impact of this facility. Like you said, it deals with chickens, it deals with... But it's the same problem, Counsel. You're trying to address a manure problem. Whether it comes from chickens, pigs, sheep, cattle, or wild horses in burrow, it's the same problem, is it not? We don't want the waste from these facilities polluting the groundwater. Your Honor, there's... So complying with the CAFL permit doesn't mean that there's not significant impacts under NEPA. Again, so the permit itself is like you can't discharge into waters of the United States unless you have a NPDES permit. So it's not saying that there's going to be no discharge at all, but that they have to comply with certain standards. And that's what the D.C. Circuit held in Calvert-Cliffs was saying that following a permit just shows that they didn't exceed those regulatory standards and not that there will be no significant environmental harm. And, again, that's what the Ninth Circuit held in Environmental Defense Center v. Rowan specifically. But if the contract requires the contractor to take affirmative steps to address this problem and the contractor has, in fact, established waste-holding ponds, berms, graded the pens so that the surface water runs off, why can't the agency look at that in determining whether or not this particular concern is adequately addressed in the operation of the facility? Again, they never did look at that. They just said that these issues are outside the scope of this analysis. They didn't actually take a hard look at these issues. But I thought those requirements were included in the contract, that you've got to get a permit and you have to follow the requirements of the permit so that we ensure that the manure doesn't pollute the groundwater. Yes, Your Honor, but the problem is that BLM itself never said these ñ never explained how these specific requirements will make the impacts insignificant under these circumstances. They didn't even ñ the CAFO permit had not even been started when they had this. So its violation is even worse than in the case of saying you can't rely on a permit because here there was no permit. Well, are you taking the position that the facility as operated is polluting the surrounding groundwater in Winnemucca? Your Honor, there are specific concerns that would show that it could be, but they didn't ñ and we raised those concerns. But you don't have any evidence in the record. We don't have any evidence that it actually is a problem. No, when this case was brought, it wasn't operating at the time. And again, the EPA has said that 75 percent of CAFOs will experience discharge based on standard operating profiles. So, again, it was their duty to take an independent hard look at these impacts, and instead they said it was outside the scope. Thank you. Thank you. Thank you both for your arguments this morning, this case is submitted. And Ms. Jaffe, we thank you in particular for being here during the government shutdown. And we are adjourned for the day. Thank you.
judges: TALLMAN, BADE, LEE